CARLOS ARMSTRONG E HIJOS SUCRS., INC., demandante y recurrida, *v.* JUAN DÍAZ SANTINI y ASOCIACIÓN DE MAESTROS DE PUERTO RICO, demandados y recurrentes.

*Número:* R-64-225     *Resuelto:* 11 de marzo de 1968

*José Raúl Cancio,* abogado de la Asociación de Maestros de Puerto Rico; *Antonio Zapater Cajigas,* abogado de la recurrida.

Sala Primera integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo, Rigau y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Se trata en este caso de si procede o no la aplicación del Art. 1489 del Código Civil, 31 L.P.R.A. sec. 4130, el cual lee como sigue:

"Los que ponen su trabajo y materiales en una obra ajustada alzadamente por el contratista, no tienen acción contra el dueño de ella sino hasta la cantidad que éste adeude a aquél cuando se hace la reclamación."

Aunque el caso debe resolverse a base del contrato celebrado entre la Asociación de Maestros de Puerto Rico, denominada de aquí en adelante la Asociación, y el contratista

Juan Díaz Santini en 2 de marzo de 1960, conviene para un mejor entendimiento de la situación hacer una síntesis de los hechos desde sus comienzos.

En enero de 1958 la Asociación compró unos terrenos en Ponce para hacer una urbanización. La Junta de Planificación aprobó el proyecto y en 24 de noviembre de ese año la Asociación contrató con Díaz Santini para el desarrollo de los terrenos en solares, calles, etc. Dicho desarrollo comprendía la preparación de 119 solares. El precio de la obra, después de sufrir unos ajustes, quedó acordado en $195,262.84. Se fijó un plazo de 365 días para la terminación de esos trabajos—plazo que vencía el 23 de noviembre de 1959—y se pactó que si la obra no se terminaba dentro de dicho plazo el contratista pagaría a la Asociación una penalidad de $50.00 por cada día de retraso. Simultáneamente con el desarrollo de los terrenos el contratista inició la construcción de casas mediante contratos individuales con los maestros respectivos. El contratista no terminó el desarrollo de los terrenos en el tiempo pactado y en marzo de 1960 abandonó dicha obra. La preparación de los terrenos fue terminada por la Asociación en junio de 1961.

En el curso de lo anteriormente relatado, en 2 de marzo de 1960, la Asociación celebró un nuevo contrato con Díaz Santini, otorgado en San Juan ante el Lcdo. Luis Miranda Correa, para la construcción por Díaz Santini de 39 casas en la urbanización antes mencionada. Luego de ciertas modificaciones el contrato se aumentó a 41 casas y el precio de la obra quedó en $306,975.00. Entre otras, este contrato contiene las siguientes cláusulas. Las obras se terminarían en o antes del 1ro. de septiembre de 1960. El contratista se comprometió a "indemnizar" a la Asociación con una suma igual al 8% del valor de cada casa no terminada para el 1ro. de septiembre de 1960 o con una suma mayor, si ése fuere el caso, por concepto del "costo adicional" de las viviendas, como consecuencia de la necesidad de obtener un

nuevo contrato de financiamiento. También se pactó que la Asociación retendría una suma igual al 5% de cada pago al contratista por labor realizada, para asegurar la corrección de cualesquiera defectos de construcción, cuya suma se retendría por un período de 3 meses, a partir de la fecha en que la Asociación recibiese cada casa como terminada. También se comprometió el contratista a responder por cualquier otra suma, en exceso de ese 5%, en cualquier fecha antes o después de la convenida en el contrato.

Tampoco terminó el contratista dentro del plazo pactado las obras objeto de este segundo contrato y las abandonó en octubre de 1960. Mediante acuerdos posteriores el contratista reanudó la construcción de las casas y las terminó más tarde.

La demandante, una firma que se dedica a la venta de materiales de construcción, suplió a Díaz Santini materiales de esa naturaleza entre el 1ro. de mayo y el 30 de agosto de 1960, los cuales se utilizaron en la construcción de las antes mencionadas casas. Al fracasar tentativas extrajudiciales de cobro la demandante presentó una demanda contra el contratista Díaz Santini y la Asociación en 14 de septiembre de 1960 para cobrar la suma de $26,982.76 que por concepto de materiales vendídoles le debía el contratista. La demandante alegó la existencia del contrato antes mencionado entre la Asociación y el contratista de 2 de marzo de 1960, mediante el cual se pactó la construcción de las casas; alegó haber suplido los materiales de construcción antes mencionados; alegó la existencia de la deuda; y alegó que la Asociación le adeudaba al contratista una suma de dinero en exceso de la deuda que el contratista tenía para con la demandante. Basándose en el anteriormente transcrito Art. 1489 del Código Civil la demandante solicitó que el tribunal condenase a los demandados a pagarle la antes mencionada suma, los intereses, costas y honorarios de abogado.

El demandado Díaz Santini nunca contestó la demanda y oportunamente se le anotó la rebeldía. La demandada Asociación de Maestros negó "todos y cada uno" de los hechos alegados en la demanda, pero a pesar de ello resultaron ciertos. Ante nos, y en calidad de Exhibit I de la demandante y de la demandada, tenemos fotocopia del contrato celebrado en 2 de marzo de 1960 entre la Asociación y el contratista Díaz Santini. Desde luego, hay otra prueba documental y oral. El Tribunal Superior declaró con lugar la demanda. La declaró con lugar en su totalidad en cuanto a Díaz Santini y en cuanto a la Asociación la limitó a la suma de $11,106.50, con costas, sin honorarios de abogado. La demandante no solicitó revisión pero sí lo hizo la codemandada Asociación de Maestros.

La recurrente señala los siguientes dos errores:

1. Erró el Tribunal Superior al concluir que la Asociación de Maestros hizo un pago indebido al contratista en 11 de agosto de 1960, y que por ser una modificación posterior de los términos del contrato el pago no perjudica a la demandante suplidora de materiales en fechas anteriores."

2. "Erró el Tribunal al no concluir que nada debía la Asociación de Maestros al contratista."

Veamos ahora la naturaleza de la disposición legal que aquí se invoca—el Art. 1489 del Código Civil.

Dicho artículo dispone, en esencia, que los que suplen trabajo y materiales para una obra ajustada alzadamente por el contratista tienen acción contra el dueño de la obra hasta la cantidad que éste le adeude al contratista a la fecha en que se hace la reclamación.

Como puede verse, esta disposición es una excepción a los principios informadores de la contratación en nuestro ordenamiento pues la regla general es que los contratos sólo producen efecto entre las partes que los otorgan y sus herederos. Código Civil, Art. 1209; 31 L.P.R.A. sec. 3374. Sin embargo, a pesar de dicha regla general el citado Art. 1489

trae en cierta forma al contrato a un tercero, esto es, a una parte que no figuró en el contrato original celebrado entre el dueño y el contratista—aquella que puso trabajo o materiales en la obra. Conforme a los principios generales de la contratación, y en ausencia del citado Art. 1489 ó de otras disposiciones especiales, [1] los obreros y los suministrantes sólo tendrían contra el dueño de la obra la acción subrogatoria que, en la hipótesis del Art. 1064 del Código Civil, les correspondería como acreedores del contratista. Pero el Art. 1489 les concede en cambio una acción directa contra el dueño o comitente. Desde luego, para que el dueño de la obra no se vea obligado a pagar dos veces, esto es, al contratista y también a los obreros y suministrantes, el Art. 1489 especifica que la acción procede solamente hasta la cantidad que el dueño adeude al contratista cuando se hace la reclamación. Sobre el particular puede verse Puig Peña, *Compendio de Derecho Civil Español* (1966) Tomo III, Vol. 2, pág. 843; Manresa, *Comentarios al Código Civil Español*, 5ta ed. (1950), Tomo X, pág. 934; Castán, *Derecho Civil Español, Común y Foral*, 9na. ed. (1961), Tomo IV, pág. 462; Scaevola, *Código Civil*, 2da. ed. (1951), Tomo 24, Parte 2da., pág. 157; Puig Brutau, *Fundamentos de Derecho Civil*, Tomo II, Vol. 2 (1956), pág. 397. [2]

■ Señalan los autores, que el derecho y la acción que da el Art. 1489 se funda en motivo de equidad, "por no ser lícito que dueño o empresario, o ambos, hasta por fraudulenta confabulación, se enriquezcan dañadamente con el esfuerzo o la aportación impagada de operarios y materialis-

---

[1] Como por ejemplo, el gravamen sobre la obra concedido por ley a los obreros. 29 L.P.R.A. sec. 186.

[2] El Tribunal Supremo de España (Sentencia de 30 de junio de 1920; 150 *Jurisprudencia Civil* 761) y la generalidad de los autores califican de excepcional el carácter del Art. 1489 (1597 español) pero Scaevola prefiere creer que estamos ante una adecuación de la norma subrogativa contenida en el Art. 1111 español (1064 de Puerto Rico) *loc. cit.* 160.

tas." Castán, *loc. cit.* 462. Además, véase Scaevola, *loc. cit.* 159; y Puig Peña, *loc. cit.* 843. Nart considera la acción aquí discutida como una auténtica acción de enriquecimiento injusto—*actio in rem verso.* Véase su excelente artículo, de indudable actualidad en Puerto Rico, "Contrato de Obra y Empresa," *Revista de Derecho Privado,* Tomo 35 (1951), págs. 814, 825. Puig Brutau, señala que en ausencia del Art. 1489 los intereses de obreros y suministrantes estarían protegidos, pero con todos los inconvenientes que resultan de su carácter subsidiario, mediante la acción subrogatoria del Art. 1111 español (1064 de Puerto Rico) a menos que la jurisprudencia estimase que se trata de una situación que por sus propios méritos autoriza el ejercicio de un *actio in rem verso.* Cree dicho autor que esa tendencia del derecho de juristas dio lugar a la recepción en el derecho legislado del precepto contenido en el citado Art. 1489 del Código Civil de Puerto Rico (1597 español). Puig Brutau, *loc. cit.* 397.

En armonía con el carácter equitativo del remedio que a obreros y suministrantes da el Art. 1489, para que el pago hecho por el dueño de la obra al contratista derrote los derechos de aquéllos es menester que el pago sea hecho de buena fe. Si el pago es malicioso o simulado no los derrota. En palabras de Scaevola, la connivencia del dueño con el contratista en perjuicio de obreros y materialistas establecerá una evidente paridad con el pago de mala fe. *Loc. cit.* 163. En el mismo sentido véanse Manresa, *loc. cit.* 935 y Puig Peña, *loc. cit.* 844.

Regresando al caso de autos, no hay controversia en cuanto a que el contrato para la construcción de las casas especificaba que la Asociación retendría el 5% de los pagos que habría de hacer al contratista; que la Asociación retendría el importe de ese 5% por un período de 3 meses a partir de la fecha en que la Asociación recibiese cada casa terminada; y que a pesar de eso la Asociación pagó al contratista por concepto de ese 5% la suma de $11,106.50, en 15 de agosto de

1960, antes de éste haber terminado las casas a que dicho pago correspondía. Aproximadamente dos meses después de hacérsele ese pago del 5%, en octubre de 1960, el contratista abandonó la construcción de las casas. Ya antes, en marzo de 1960, había abandonado el desarrollo de los terrenos.

De 1ro. de mayo al 30 de agosto de 1960 la demandante suplió materiales al contratista. José Luis Pasarell, Presidente y Administrador de la demandante, declaró que el contratista le debía por dichos materiales la suma de $26,982.76; que solicitó en distintas ocasiones del contratista el pago de dicha suma; y que el contratista le contestaba que además del beneficio de un 10% que tendría en esa obra, había el 5% que le retenía la Asociación y que ese 5% "era casi un seguro" para la demandante.

El pago de ese 5% hecho por la Asociación al contratista antes de vencerse la condición especificada para ello en el contrato es el pago que el tribunal de instancia halló que "debió ser retenido por la Asociación . . . conforme al contrato . . ." y el cual fue hecho "por acuerdo mutuo entre el contratista y la Asociación."

■ La posición de la recurrente es que nada debía al contratista cuando la demandante presentó su demanda y que por lo tanto nada tiene que pagarle a ésta. Se basa en que las penalidades en que incurrió el contratista por su tardanza absorbieron el balance que a su favor quedaba. No podemos aceptar esa posición. En primer lugar, las penalidades que surgieron del contrato para el desarrollo de los terrenos no son oponibles al derecho de obreros y suministrantes que surge del contrato de la construcción de las casas. Son esos dos contratos distintos y las cláusulas de uno, salvo pacto en contrario, no las puede pasar la recurrente unilateralmente y *a posteriori* al otro. De muy poco serviría la protección que da el Art. 1489 si eso pudiese hacerse. El Tribunal Supremo de España ha resuelto sobre el particular:

"Considerando que la exigencia del suministro de materiales y trabajos con motivo del contrato a precio alzado, como otro de los requisitos propios y característicos de la acción examinada, comunica a la misma un carácter especial y objetivo, ya que con ella se elimina el cobro mediante dicha acción, de cuantos débitos surgieren a cargo del contratista y en favor del proveedor, por razón de obras diferentes como efecto de relaciones jurídicas extrañas a dicho suministro, y aún a resultas de las mismas obras si el suministro no trajese causa del cuestionado convenio y que si estas limitaciones aparecen naturales frente al acreedor refaccionario acaece igual fenómeno en perjuicio del propietario, quien por este motivo *no podrá oponer a tal acreedor las reclamaciones y excepciones nacidas de otros negocios jurídicos habidos con su contratista y cargados en la cuenta de éste,* ni podrá enervar la acción directa analizada con obstáculos y apariencias de derechos engendrados a la sombra de otros actos o hechos diferentes del contrato de obras a precio alzado origen de esa acción que en nada atañen a la veracidad del suministro en que la misma se basa." (Énfasis nuestro.)—Sentencia de 11 de junio de 1928, 184 *Jurisprudencia Civil* 134, 145.

En el mismo sentido véase Scaevola, *Código Civil,* Tomo 24, 2da. ed., pág. 164.

En segundo lugar, la penalidad que encontramos en el contrato de las casas consiste en el deber del contratista de pagar a la Asociación el 8% del valor de las casas no terminadas a tiempo, o una suma mayor si así resultase, para "indemnizar" a la Asociación por el "costo adicional" en que ésta incurriese en sus gestiones de financiamiento ocasionado por la tardanza de aquél. No hubo prueba de que la Asociación incurrió en dicho costo adicional.

La prueba demuestra que el importe del contrato de las casas según ajustado quedó en $306,975.00 y que hasta el 18 de agosto de 1960 la Asociación había hecho pagos al contratista montantes a $228,275.00, lo cual dejaba un balance a favor de éste de $78,700.00.

Contra ese balance la Asociación pretende deducir las siguientes partidas: (a) $4,100.00 "para sufragar parte de

los gastos administrativos del proyecto y del Plan de Hogares de la Asociación . . ." a base de $100.00 por cada casa construida, cuya suma pagaría a la Asociación el contratista "en el instante de recibir el último pago de cada casa" (Cláusula novena del contrato); (b) $2,400.00 por concepto de gastos legales incurridos por razón del incumplimiento del contratista; (c) $24,186.00 en virtud de la cláusula séptima del contrato (el 8% para indemnizar a la Asociación por costos adicionales de financiamiento); (d) $33,634.95 por concepto del costo de terminación de las casas.

No es necesario que entremos a discutir cuáles de esas partidas son y cuáles no son oponibles a los suministrantes porque aún suponiendo, sin decidirlo, que procediese su deducción del balance que a favor del contratista quedaba, todavía quedaría suficiente dinero a favor de éste para cubrir la sentencia dictada por el tribunal de instancia en este caso. Tampoco es necesario que califiquemos el pago por adelantado que se hizo del 5% que según el contrato la Asociación debía retener hasta pasados tres meses de la fecha en que la Asociación recibiese las casas terminadas, pero nada hay en la sentencia del tribunal de instancia sobre el particular que debamos revocar. Éste es el planteamiento hecho en el señalamiento de error número uno. Por lo anteriormente expuesto concluimos que tampoco se cometió el error número dos.

*Se confirmará la sentencia dictada en este caso por el Tribunal Superior, Sala de Ponce, 16 de octubre de 1964.*