ROBERTO ROMÁN & CÍA., INC., demandante y recurrida, *v.* JOSÉ NEGRÓN CRESPO, INC., THE COMMONWEALTH INSURANCE COMPANY, COMPAÑÍA DE FOMENTO INDUSTRIAL DE PUERTO RICO, demandados y recurrente la última.

*Número:* R-78-32 *Resuelto:* 16 de julio de 1979

*Géigel, Silva, Soler Favale & Arroyo* y *Medrich Torres Ramos*, abogados de la recurrente Compañía de Fomento Industrial de Puerto Rico; *María Luisa Colón Guerra*, abogada del Comisionado de Seguros de Puerto Rico en su carácter de Administrador-Liquidador de The Commonwealth Insurance Company; *Juan Lorenzo Rodríguez*, abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR MARTÍN emitió la opinión del Tribunal.

La Compañía de Fomento Industrial de Puerto Rico encargó a José Negrón Crespo, Inc. (en adelante "la contratista") la construcción de la Urbanización Industrial núm. L 35-072 en el Barrio Santana de Arecibo, Puerto Rico, por cantidad ajustada alzadamente de $3,398,000, afianzando Commonwealth Insurance Company la ejecución y pago del 100% de la obra. La contratista pactó a su vez con Roberto Román & Cía., Inc. (en adelante "la demandante") la realización de ciertas labores en el proyecto en cuestión referentes a la limpieza del terreno y su subsiguiente relleno y preparación, adeudándosele por tal concepto la suma de $138,239.35, razón por la cual entabló ésta, en 19 de diciembre de 1977, reclamación contra la contratista, la comitente y la fiadora.

A tenor con el contrato que celebraron la Compañía de Fomento y la contratista, aquélla podría retener a modo de garantía del fiel cumplimiento del contrato el 10% de los pagos que le fuera haciendo a la contratista según progresara el proyecto. Al momento de la interposición de la demanda las sumas retenidas ascendían a $295,489.92 aumentando a $337,315.49 para la fecha del juicio.

La demandante sostiene, sin embargo, que a pesar de que por disposición contractual dichos fondos se han retenido por la Compañía de Fomento para enjugar cualquier daño que ésta sufra por cualquier incumplimiento de la corporación contratista en la realización de la obra, puede la demandante hacer caso omiso del propósito de la retención y por virtud del Art. 1489 del Código Civil, hacer efectiva su acreencia contra

dicha Compañía de Fomento con independencia de las resultas de la obra. Así lo entendió también el tribunal sentenciador, acudiendo la Compañía de Fomento en revisión ante nos. Expedimos el auto para revisar.

Ante estos hechos debemos definir con la exactitud que sea posible, cuál es el contenido normativo del Art. 1489 del Código Civil para asegurarnos al aplicarlo, de no conceder garantías o privilegios distintos de los que de él se nutren. Es de rigor, pues, acudir a la ingente ayuda que ofrecen el historial de la norma, las sabias interpretaciones que de ella hace la científica doctrina y las útiles directrices jurisprudenciales.

## II

El Art. 1489 de nuestro Código Civil, similar al 1597 del Código Civil español dispone:

"Los que ponen su trabajo y materiales en una obra ajustada alzadamente por el contratista, no tienen acción contra el dueño de ella sino hasta la cantidad que éste adeude a aquél cuando se hace la reclamación." 31 L.P.R.A. sec. 4130.

El transcrito precepto procede del Código Civil francés[1] y aparece por primera vez en el derecho hispánico en el Proyecto de García Goyena de 1851. En el Art. 1798 del Código Civil francés, se le dio amparo exclusivamente a la mano de obra y al trabajo del obrero. La jurisprudencia y la glosa francesa, reaccionaron denunciando la parquedad del principio que dejaba desprovistos de protección a los proveedores de materiales. El movimiento codificador español recogió la bien fundada crítica que se hiciera en Francia y ya el citado Proyecto de 1851 extendía la protección del precepto

---

[1]El Art. 1798 del Código Civil francés dispone:

"Los albañiles, carpinteros y otros obreros que se hayan empleado en la construcción de un edificio o de otras obras hechas por precio alzado, no tienen acción contra aquel para el cual se han hecho las obras más que hasta la cantidad por la que éste resulte deudor para con el contratista, en el momento en que aquéllos interpongan su acción."

a los materialistas. Q. M. Scaevola, *Código Civil*, 2da ed., Madrid, 1951, Tomo XXIV, pág. 158.

Buscando fundamento en su historial hubo de suscitarse controversia doctrinal sobre la naturaleza jurídica del artículo, sosteniendo cierto sector que se trataba de una modalidad de la acción subrogatoria que asiste a todo acreedor por mor del Art. 1111 del Código Civil español equivalente a nuestro 1064.(²) De manera dominante, sin embargo, se concibe hoy el precepto que nos ocupa como una verdadera acción directa propia de los materialistas y obreros. *Amer. Surety Co.* v. *Tribunal Superior*, 97 D.P.R. 452, 456 (1969); J. Castán Tobeñas, *Derecho Civil Español, Común y Foral*, 10ma ed., Madrid, 1977, Tomo 4to, págs. 493–494; M. Albaladejo, *Curso de Derecho Civil Español, Común y Foral*, Barcelona, 1977 Tomo II, pág. 457. Como señala Muñoz, "el artículo [1489] modifica el principio establecido en el artículo [1064] y concede a los obreros y proveedores de materiales una acción directa contra el dueño de la obra . . . ." L. Muñoz, *Comentarios a los Códigos Civiles de España e Hispanoamérica*, México, D.F., 1953, pág. 833.

 Esta acción directa resulta como excepción al principio general de relatividad eficiente de los contratos que postula que éstos tienen efecto solamente entre los otorgantes y sus causahabientes. Sus consecuencias representan un privilegio para suplidores y obreros. En primer lugar, quedan liberados de la forzosa excusión en los bienes del deudor principal que requiere el Código como paso anterior a la acción subrogatoria. *Amer. Surety Co.* v. *Tribunal Superior*, supra, pág. 455. Más aún, la acción directa tiene el efecto, que mucho beneficia al materialista y al obrero, de acotar sus reclamaciones frente al comitente dentro del ámbito exclusivo

---

(²)"Los acreedores después de haber perseguido los bienes de que esté en posesión el deudor para realizar cuanto se les debe, pueden ejercitar todos los derechos y acciones de éste con el mismo fin, exceptuando los que sean inherentes a su persona; pueden también impugnar los actos que el deudor haya realizado en fraude de su derecho." 31 L.P.R.A. sec. 3028.

de la relación contractual que dio margen a su acreencia. Así, sus caracteres son los de ser una verdadera medida de ejecución y medio de pago al acreedor, otorgar un derecho de preferencia a los acreedores favorecidos, y la inoponibilidad de excepciones que no surjan del propio acercamiento jurídico de donde surgió inicialmente el crédito que se ejercita. J. Santos Briz, *El Contrato de Ejecución de Obra y su Problemática Jurídica*, 56 Revista de Derecho Privado 379, 408 n. 61 (1972). A tales efectos, por ejemplo, el comitente no puede invocar frente a la reclamación del materialista la compensación a que tenga derecho como consecuencia de créditos que, producto de relaciones extrañas al contrato de empresa, ostenta contra el contratista. Scaevola, *op. cit.*, pág. 164. Tampoco puede oponer el pago cuando éste se ha efectuado desatendiendo las prescripciones contractuales. *C. Armstrong e Hijos* v. *Díaz*, 95 D.P.R. 819, 826 (1968).

No obstante, es de lapidaria importancia tener presente que la acción concedida por el Art. 1489 "no supone modificación de la situación sustantiva previa que rigiera las relaciones entre comitente y contratista y entre éste y los actores, [ni] su ejercicio lleva aparejado la creación de una nueva relación sustantiva comitente-accionante." R. de A. Yagüez, *Los Créditos Derivados del Contrato de Obra*, Madrid, 1969, pág. 83. Válidos argumentos puede esgrimir el comitente en el proceso que conduzcan a establecer el verdadero monto del crédito de que debe responder ya que "la cuantía o existencia del mismo no puede fijarse únicamente por confesión judicial del contratista, pues sólo contra su autor puede esgrimirse lo confesado." *S. del T.S. de España de 29 de junio de 1936*.

Este proceso dirigido a precisar el *quantum* a que tendrá derecho el reclamante es bien resumido por Yagüez en la pág. 96 de su obra:

"Dentro del procedimiento probatorio de esas existencia y cuantía del crédito del contratista contra el comitente, hay que precisar que puesto que este último no puede verse obligado a pagar

más de lo que debiera pagar al contratista, lo que realmente deberá determinarse en el proceso será la cuantía 'real' del mismo crédito. Decimos 'real' porque estimamos que el crédito, que documentalmente puede estar fijado en una cierta cantidad, puede verse alterado, como lo sería en el supuesto de una reclamación por parte del contratista afectada por aumentos o disminuciones procedentes:

a) De un aumento o disminución de la obra proyectada y su correspondiente presupuesto.

b) De la responsabilidad contractual del contratista, que deberá suponer una disminución del crédito que contra el comitente posee, en el supuesto de defectuosa o incompleta ejecución de la obra a él encomendada. Esta responsabilidad deberá ser fijada en el mismo proceso entablado en virtud del artículo 1.597, judicialmente, *o como aplicación de una posible y frecuente cláusula penal introducida en el contrato de ejecución de obra que dio origen al crédito del contratista.*" (Énfasis suplido.)

Y Muscius Scaevola, con la claridad que le distingue, abunda diciendo:

"Ordinariamente ya lo hemos dicho, en los contratos de construcción de edificios o de decorado de los mismos, o en los de encargo de maquinaria, etc., suelen establecerse cláusulas para garantizar la calidad de los materiales o la sujeción estricta a los planos (una forma determinada) o la estabilidad de la construcción durante mayor tiempo del legal (porque condiciones quitan leyes), o la entrega de la obra en día predeterminado. En estas cláusulas, o bien se reserva el pago del todo o de alguna parte del precio hasta la recepción definitiva de la obra, o se impone por vía de penalidad una multa de un tanto por cada día que se difiera la entrega del edificio o cosa. ¿Afectarán estos aplazamientos o decrecimientos del precio al derecho de los operarios o suministrantes? En nuestro sentir, sin discusión. La clave de la acción del empresario, lo mismo que la de la facultad excepcional de trabajadores y materialistas a reclamar directamente del dueño, es el contrato de obra; esta es la ley fundamental de la relación entre ellos establecida y desenvuelta. Lo que por el susodicho contrato, o por sus novaciones, o por las mejoras *extras*, adeude el dueño al empresario con calidad de líquido y vencido, es decir, exigible, sobre eso y no sobre otra cosa podrá versar la petición. El privilegio, si así queremos llamarle, carece de dinamismo para agravar las obligaciones del dueño. Si la obra es repelida por no reunir las condiciones estipuladas, al no nacer la

obligación de pago, nada deberá el dueño al contratista, y nada tampoco a los que cooperaron a su ejecución con su trabajo y materiales, por contratos directos con el segundo. Si el precio o parte de él quedó diferido hasta el transcurso de cierto tiempo, como garantía de estabilidad de la construcción, o por otros aplazamientos pactados de mutua conveniencia en la economía de ambas partes contratantes, la acción de asalariados y proveedores no será eficaz hasta que el crédito contra el dueño sea exigible. Si el precio a efectivizar resultase menguado por la exacción de las multas convenidas, no habrá de inferirse de esto que la sanción penal recae sobre los que no contrataron con el dueño, ni pudieron incurrir en ellas: mas sí se inferirá que la responsabilidad del dueño (deuda) quedó disminuida, y que con la misma cuerda y la misma abertura de compás se mide la obligación del dueño y el derecho de los beneficiados por el artículo que comentamos." Q. M. Scaevola, *op. cit.*, págs. 165–166.

Felipe Clemente de Diego, por su parte, al enfrentarse a situación similar a la de autos, concluye en su Dictamen Núm. 28(³) de la siguiente manera:

". . . lo que deba y desde cuando lo deba el dueño de la obra al contratista, se ha de decidir por el contrato mismo de obra, ya en cuanto al precio, ya en cuanto a la fianza y fondo de garantía, sin olvidar que éstos, tanto la fianza como el fondo, son garantías afectadas preferentemente a determinadas responsabilidades, que no estando cubiertas no pueden ser invertidas en otras atenciones. En rigor, fueron sustraídas del patrimonio del deudor (contratista), como antes hemos dicho, para responder de determinadas obligaciones y no otras; cubiertas aquéllas, ya el sobrante reingresará en el patrimonio del deudor y podrá ser captado por los restantes acreedores." F. Clemente de Diego, *Dictámenes Jurídicos*, Barcelona, 1958, Tomo II, págs. 504–505.

Este Tribunal se hizo eco de esa general posición de los comentaristas y, recientemente, en *Armstrong, Etc.* v. *Inter-Amer. Builders, Inc.*, 98 D.P.R. 734, 741 (1970), citando la *Sentencia del Tribunal Supremo de España de 11 de junio de 1928*, expresamos:

(³)Se le consultaba al distinguido comentarista si los proveedores del contratista podían actuar contra la fianza y fondo de garantía que el comitente tenía en su poder como garantía del exacto cumplimiento por el contratista de lo pactado entre ellos.

"... el suplidor no adquiere ante el dueño de la obra más derechos que los que tenía el contratista, de manera que la cantidad adeudada está sujeta necesariamente a liquidación por razón de reajustes o posibles reclamaciones recíprocas que surjan en relación con la obra contratada entre el contratista empresario y el dueño de la misma. Sin embargo, tales reajustes no incluyen la variación del precio del contrato de construcción por convenio privado entre el contratista y el dueño de la obra en perjuicio de los que suministran materiales."

## III

Como vemos, la doctrina científica y la jurisprudencia sostienen una posición uniforme respecto a la naturaleza jurídica del citado Art. 1489 del Código Civil que es contraria a la interpretación hecha por la sala de instancia. El legislador estableció en él un fino balance del triangular conflicto de intereses que a menudo se suscita en el contrato de empresa. Concedió al materialista y al obrero el beneficio de una acción directa contra el principal con las ventajas que, tal como hemos reseñado, esa acción conlleva. Mas no llegó a establecer a través del citado precepto una alteración de la naturaleza de la obligación principal, para imponerle al dueño, en quien no necesariamente radica el poder económico, la obligación de aceptar indefenso el perjuicio que acarrea una obra ruinosa o tardía, tornando inoficiosas las garantías que en previsión de ese daño se pactaron en el contrato.

Una solución contraria no sería sino la alteración de ese balance por fíat judicial sin que nos corresponda a nosotros esa tarea. Aplicaríamos una norma distinta de la que "quieta y abstractamente vive en los cuerpos legales." E. Ruiz Vadillo, *La interpretación de las normas jurídicas en el nuevo título preliminar del Código civil español,* 4 Documentación Jurídica 1207 *et seq.* (1974).

Más aún, el hecho de la retención por el comitente puede representar garantía adicional para materialistas y obreros que cuentan con una suma que se mantendrá al margen de la suerte que pueda correr el patrimonio del contratista y

permanecerá segura en manos del comitente sólo sujeta a la efectiva realización de la obra.

## IV

Mas no podemos con lo dicho hasta ahora disponer del recurso.

Surge de los autos que la demanda que interpusiera Roberto Román & Cía., Inc., contra la Compañía de Fomento se presentó en 19 de diciembre de 1975, (4) contestando ésta en 13 de enero de 1976. En 6 de febrero de 1976, la codemandada Commonwealth Insurance Company se hizo cargo de la obra que fuera abandonada por José Negrón Crespo, Inc., y estando laborando en la misma recibió de la Compañía de Fomento el pago de $351,197.21 ya trabada la controversia de autos. Esta particular circunstancia nos obliga a examinar la doctrina que establecimos en *Amer. Surety Co.* v. *Tribunal Superior*, 97 D.P.R. 452 (1969), para determinar si la Compañía de Fomento puede oponer válidamente a la demandante ese pago que hiciera a Commonwealth Insurance.

En *Amer. Surety Co.* v. *Tribunal Superior*, supra, dijimos:

"Este carácter directo de la acción produce el importantísimo efecto de sustraer el importe de lo reclamado por el obrero o materialista de las reclamaciones de otros acreedores del contratista, pues desde el instante en que se hace la reclamación al dueño, éste se convierte en deudor de los obreros y materialistas del empresario. Scaevola, *op. cit.*, a la pág. 138, dice al resumir la jurisprudencia francesa sobre el particular '. . . desde que el dueño es demandado por los obreros, se convierte en deudor de éstos, dejando de serlo del empresario, hasta el punto de que los acreedores particulares de éste no podrán concurrir con los operarios en la suma debida por el dueño', y equipara la posición del materialista a la de un edificante de buena fe en los casos de accesión. Al considerar el caso de quiebra o concurso del contratista, otro tanto señala Manresa, *op. cit.*, pág. 935, al decir que 'Si antes del tal declaración los que pusieron su

---

(4)En el caso de autos la demandante alegó que acudía a la acción directa contra el principal luego de infructuosamente reclamar el pago al contratista. Sobre el requisito de reclamación previa al contratista ver R. de A. Yagüez, *op. cit.*, págs. 52–53.

trabajo o materiales en la obra habían demandado ya al dueño, este crédito no irá a la masa, porque desde el momento de la demanda se debe estimar que el dueño a quien debe es a sus demandantes y no al contratista'." Pág. 456.

■ Como vemos, la presentación de la demanda y su subsiguiente notificación al principal, tiene el efecto de convertir al materialista accionante en acreedor directo del principal con prelación al propio contratista.

■ Commonwealth Insurance como sucesora que fuera de José Negrón Crespo, Inc., por virtud del contrato de fianza que se otorgara, no tiene más derechos frente a las partes que los que tenía su fiada. Tampoco tenía la Compañía de Fomento más obligación para con ella que la que tenía frente a José Negrón Crespo, Inc. Así pues, el pago que se hiciera a Commonwealth Insurance Co., en perjuicio de la reclamación ya interpuesta por el materialista, y con fondos no sujetos contractualmente a contingencia alguna, no puede oponérsele a éste para enervar sus derechos.

*Por esos fundamentos, la sentencia del Tribunal Superior que ordenó a la Compañía de Fomento Industrial de Puerto Rico a satisfacer a la demandante la cantidad de $138,239, intereses, costas y $500 por concepto de honorarios de abogado, deberá confirmarse, imponiéndosele además a la recurrente el pago de las costas de la revisión.*

El Juez Asociado Señor Díaz Cruz emitió opinión disidente, concurrente en el resultado, a la cual se unen los Jueces Asociados Señores Rigau y Dávila.

—O—

Opinión disidente, concurrente en el resultado, del Juez Asociado Señor Díaz Cruz a la que se unen los Jueces Asociados Señores Rigau y Dávila.

San Juan, Puerto Rico, a 16 de julio de 1979

La Compañía de Fomento Industrial contrató a José

Negrón Crespo, Inc., para la construcción de la Urbanización Industrial Santana, en Arecibo, por precio alzado de $3,398,000.00 y como requisito de la comitente el contratista obtuvo de la Commonwealth Insurance Company una fianza de ejecución y pago garantizando en un 100% la realización de la obra. José Negrón Crespo, Inc., a su vez subcontrató con la demandante recurrida Roberto Román & Cía., Inc., la parte del desarrollo consistente en limpieza de la finca de 101 cuerdas, amontonamiento de la capa vegetal, corte para relleno de 94,000 metros cúbicos y traslado y compactación de 400,456 metros cúbicos de relleno, al cabo de cuya actividad la contratista general quedó adeudando a la subcontratista Román & Cía, Inc., por labor y materiales suplidos, la cantidad de $138,239.35. Los pagos de Fomento a su contratista se hacían mediante certificaciones acreditativas del progresivo desarrollo de la obra, y como garantía adicional a la fianza de ejecución y pago, Fomento le retenía el 10% de lo pagado, cantidad ésta que para la fecha de radicación de la demanda por el subcontratista, ascendía a $295,489.92, aumentando dichos fondos retenidos a $337,315.49 para la fecha del juicio en 29 de noviembre de 1977. La acción civil fue iniciada el 19 diciembre, 1975 por el subcontratista reclamando el importe de su trabajo y dirigida contra Compañía de Fomento, dueña de la obra, la fiadora Commonwealth Insurance Co. y la contratista general Negrón Crespo, Inc. Fomento negó responsabilidad contractual y presentó demanda de co-parte contra la fiadora Commonwealth. Esta última y su fiada Negrón Crespo, Inc., contestaron la demanda y formularon reconvención contra la subcontratista demandante alegando incumplimiento del subcontrato y daños al inmueble por el método errático en el movimiento de tierra y relleno.

Cuando se inicia el pleito en junio de 1975 no había atrasos en la entrega de la obra y por el contrario ésta se hallaba "sumamente adelantada" y realizada en un 85%, según declaró el Ing. Miguel Rivera Carrasquillo, perito de la co-

demandada Compañía de Fomento (E.N.P. pág. 8).(1) La reclamación de penalidades por Fomento contra su contratista surge más tarde cuando éste abandonó la obra, y por tal concepto opone a la demanda de la subcontratista un total de $153,000 más $40,000 para corrección de deficiencias que podrían aumentar por deterioro durante la paralización de los trabajos,(2) partidas que carga a los dineros retenidos a su contratista ascendentes a $337,315.49. Concluyó el juez sentenciador que a la fecha del juicio faltaba por realizar en el proyecto labor ascendente a $52,636.00,(3) que en tiempo tomaría alrededor de veinte días para terminarlo. Antes de radicar la demanda, la subcontratista Román & Cía., Inc., notificó a Compañía de Fomento la falta de pago de sus labores por la contratista Negrón Crespo, Inc.

Celebrado el juicio, al que no comparecieron ni la fiadora Commonwealth Insurance ni su fiada Negrón Crespo, Inc., el 21 de diciembre de 1977 el Tribunal Superior, Sala de Arecibo, dictó sentencia estimando la demanda y condenando a Compañía de Fomento a pagar a la subcontratista demandante la suma de $138,239.35, intereses y costas y $500 para honorarios de abogado, y asimismo declaró con lugar la demanda de co-parte de Fomento contra la fiadora Commonwealth Insurance Company. Desestimó la reconvención de ésta y su fiada Negrón Crespo, Inc.

Recurrió en revisión la demandada Compañía de Fomento Industrial y el 2 de noviembre de 1978 expedimos el auto. Su recurso está predicado en el siguiente planteamiento:

"Erró el Honorable Tribunal Superior al concluir que la demandante se convirtió en acreedora directa de los dueños

---

(1)La exposición narrativa de la prueba aparece estipulada y certificada por ambas partes recurrida y recurrente.

(2)La fiadora Commonwealth Insurance Co. se hizo cargo de terminar la obra pero su gestión fue interrumpida al declarársele en estado de insolvencia y asumir el Comisionado de Seguros la función de Administrador-Liquidador a tenor del Cap. 40 del Código de Seguros, 26 L.P.R.A. sec. 4001 y ss.

(3)El Ing. Rivera Carrasquillo señala esta cantidad como en reserva, en adición a los $337,315.49 retenidos. (E.N.P. págs. 7 y 9.)

de la obra, Compañía de Fomento Industrial de Puerto Rico, desde el instante mismo en que se incoó su reclamación judicial el 19 de diciembre de 1975, y que su crédito no está sujeto a los vaivenes de la responsabilidad del contratista por otros conceptos."

La decisión gira en torno a la vitalidad y energía en la provisión de justicia social por el Art. 1489 del Código Civil que ordena:

Art. 1489. *Acción contra el dueño por personas que ponen trabajo y materiales en obra ajustada por contratista.*

"Los que ponen su trabajo y materiales en una obra ajustada alzadamente por el contratista, no tienen acción contra el dueño de ella sino hasta la cantidad que éste adeude a aquél cuando se hace la reclamación." 31 L.P.R.A. sec. 4130.

El presente caso ofrece una variación factual y jurídica de la acción directa del suplidor de materiales y servicios al contratista, contra el dueño de la obra, bajo el Art. 1489 del Código Civil que reconocimos en *C. Armstrong e Hijos* v. *Díaz*, 95 D.P.R. 819, 826 y ss. (1968), sosteniendo que las penalidades en que incurrió el contratista por su tardanza no son oponibles al derecho de obreros y suministrantes, cuando aquéllas se producen en contrato de construcción distinto al que generó la reclamación de éstos. Seguimos allí la sentencia de 11 de junio de 1928 del Tribunal Supremo de España que al equiparar los suplidores con el acreedor refaccionario, niega al propietario de la obra derecho a oponer a la acción civil del proveedor "las reclamaciones y excepciones nacidas de *otros negocios* jurídicos habidos con su contratista y cargados en la cuenta de éste, ni podrá enervar la acción directa analizada con obstáculos y apariencias de derechos engendrados a la sombra de *otros actos* o *hechos diferentes* del contrato de obras a precio alzado origen de esa acción que en nada atañen a la veracidad del suministro en que la misma se basa." (Énfasis nuestro.)

La recurrente en su argumento restringe la eficacia de nuestra doctrina en este campo de protección de los obreros y

proveedores de materiales en dos aspectos fundamentales: primero, en el efecto instantáneo de interdicto que sobre los dineros adeudados por el dueño de la obra al contratista genera la deducción de la acción directa de operarios y materialistas, aislando y asegurando el importe de su reclamación, sustrayéndolo de las reclamaciones de otros acreedores del empresario, y convirtiendo al dueño en deudor de dichos reclamantes, aun cuando no fueron parte en el contrato de construcción o de empresa (*Amer. Surety Co.* v. *Tribunal Superior*, 97 D.P.R. 452, 456 (1969)); y, segundo, intenta disminuir el principio de que las penalidades por incumplimiento y demás reclamaciones de insatisfacción del dueño de la obra contra su contratista por ejecución deficiente, inejecución o abandono de la misma, no son oponibles al preferente derecho de obreros y vendedores de materiales. Sostiene la recurrente Compañía de Fomento que esta norma proclamada en *C. Armstrong e Hijos* v. *Díaz*, supra, prohíbe al dueño comitente oponer a tales acreedores las reclamaciones y excepciones nacidas de *otros negocios* jurídicos habidos con su contratista y cargados a la cuenta de éste, mas permite oponerles aquellas reclamaciones del dueño de la obra contra su contratista nacidas en el propio contrato de empresa para el cual se prestaron los servicios y se suministraron los materiales quedando la reclamación por éstos diferida hasta una liquidación final en que se adjudiquen las discrepancias entre dueño y constructor y se determine si satisfechas las exigencias del primero queda balance impagado del precio alzado del contrato para entonces atender las acreencias de trabajadores y materialistas. Reclama autoridad para su contención en una cita de Scaevola.[4]

---

[4]En su obra *Código Civil*, Tomo 24, Parte Segunda, págs. 165–166, 2da ed. (1951), expone dicho comentarista:

"C) Caso de pacto especial en el contrato de obra.

"Ordinariamente, ya lo hemos dicho, en los contratos de construcción de edificios o de decorado de los mismos, o en los de encargo de maquinaria, etc., suelen establecerse cláusulas para garantizar la calidad de los materiales o la sujeción · estricta a los planos (una forma determinada) o la estabilidad de la construcción

La restricción propuesta por la recurrente no puede detener la corriente de equidad puesta en marcha por dicho Art. 1489 en favor de trabajadores(5) y materialistas que es signo de nuestra jurisprudencia enunciada en *C. Armstrong e Hijos* v. *Díaz,* y *Amer. Surety Co.* v. *Tribunal Superior,* supra, y afirmada en *Armstrong, Etc.* v. *Inter-Amer. Builders, Inc.,* 98 D.P.R. 734 (1970), con la reserva en este último que ahora rechazamos, de que la reclamación del suplidor sobre el balance adeudado al contratista "está sujeta necesariamente a liquidación por razón de reajustes o posibles reclamaciones recíprocas que surjan en relación con la obra contratada entre el contratista empresario y el dueño de la misma [y que] sin embargo, tales reajustes no incluyen la variación del

---

durante mayor tiempo del legal (*porque condiciones quitan leyes*), o la entrega de la obra en día predeterminado. En estas cláusulas, o bien se reserva el pago del todo o de alguna parte del precio hasta la recepción definitiva de la obra, o se impone por vía de penalidad una multa de un tanto por cada día que se difiera la entrega del edificio o cosa. ¿Afectarán estos aplazamientos o decrecimientos del precio al derecho de los operarios o suministrantes? En nuestro sentir, sin discusión. La clave de la acción del empresario, lo mismo que la de la facultad excepcional de trabajadores y materialistas a reclamar directamente del dueño, es el contrato de obra; esta es la ley fundamental de la relación entre ellos establecida y desenvuelta. Lo que por el *susodicho contrato, o por sus novaciones, o por las mejoras extras,* adeude el dueño al empresario con calidad de líquido y vencido, es decir, exigible sobre eso y no sobre otra cosa podrá versar la petición. El privilegio, si así queremos llamarle, carece de dinamismo para agravar las obligaciones del dueño. Si la obra es repelida por no reunir las condiciones estipuladas, al no nacer la obligación de pago, nada deberá el dueño al contratista, y nada tampoco a los que cooperaron a su ejecución con su trabajo y materiales, por contratos directos con el segundo. Si el precio o parte de él quedó diferido hasta el transcurso de cierto tiempo, como garantía de estabilidad de la construcción, o por otros aplazamientos pactados de mutua conveniencia en la economía de ambas partes contratantes, la acción de asalariados y proveedores no será eficaz hasta que el crédito contra el dueño sea exigible. Si el precio a efectivizar resultase menguado por la exacción de las multas convenidas, no habrá de inferirse de esto que la sanción penal recae sobre los que no contrataron con el dueño, ni pudieron incurrir en ellas; mas sí se inferirá que la responsabilidad del dueño (deuda) quedó disminuida, y que con la misma cuerda y la misma abertura de compás se mide la obligación del dueño y el derecho de los beneficiados por el artículo que comentamos."

(5)Fue consistente con la evolución progresista del pensamiento jurídico la inclusión del profesional que rinde servicios entre "los que ponen su trabajo" protegidos por el Art. 1489. *Empresas Capote, Inc.* v. *Tribunal Superior,* 103 D.P.R. 765 (1975).

precio del contrato de construcción por convenio privado entre el contratista y el dueño de la obra en perjuicio de los que suministran materiales." (S. 11 de junio de 1928.)

Las citas de Scaevola y de *Inter-Amer. Builders* que preceden constituyen una contradicción jurídica dentro del mayor campo de doctrina que dichas fuentes comprenden. Su preceptiva marca un retroceso a la acción subrogatoria del Art. 1064 del Código Civil(6) remitiendo a obreros y materialistas a la acción civil ordinaria que exige previa excusión y persecución de bienes en poder del contratista antes de que puedan afectar el balance a éste adeudado en poder del dueño de la obra, y ata la perspectiva de trabajadores y proveedores de materiales de cobrar lo que se les debe, a las contingencias y azares del desarrollo de la obra por el empresario, situación precisamente abolida por la concesión de acción directa del Art. 1489 contra el dueño por la "cantidad que éste adeude [al contratista] *cuando se hace la reclamación.*" Si algún propósito patente se percibe en la creación del remedio especial provisto en este Art. 1489 es el de viabilizar el pronto pago de salarios y materiales liberando sus proveedores de toda atadura con la ejecución y cumplimiento del contrato y con la aceptación de la obra por el dueño. Lo otro sería trasladar a obreros y materialistas, que no fueron parte en el contrato de construcción, la responsabilidad por las deficiencias de ejecución e incumplimiento de prestaciones por el contratista. Las penalidades y sanciones al contratista que incumple, se satisfarían con el sudor del obrero y la propiedad del proveedor.

La plena eficacia del Art. 1489 en su provisión de garantía y aseguramiento de pago de lo debido a trabajadores y

---

(6)Art. 1064. *Derechos del acreedor que ha perseguido los bienes del deudor.*

"Los acreedores después de haber perseguido los bienes de que esté en posesión el deudor para realizar cuanto se les debe, pueden ejercitar todos los derechos y acciones de éste con el mismo fin, exceptuando los que sean inherentes a su persona; pueden también impugnar los actos que el deudor haya realizado en fraude de su derecho." 31 L.P.R.A. sec. 3028.

materialistas se obtiene con el "importantísimo efecto"(⁷) de sustraer el importe de lo reclamado por ellos de las reclamaciones de otros acreedores del contratista, inclusive el dueño de la obra quien desde el instante en que se hace la reclamación adviene *deudor* de los que suplieron trabajo y bienes a su empresario. Esta garantía inherente a la referida "acción directa" opera sobre y afecta el importe de dinero retenido al contratista por el dueño de la obra y que representa la cantidad que éste adeuda a aquél al momento de incoarse la reclamación, presumiendo hasta ese instante el cabal cumplimiento por el contratista de las condiciones y términos del contrato, sin la erosión de latentes o denunciadas reclamaciones recíprocas entre dueño y contratista. El derecho de los obreros y suplidores de materiales, encarnado en la prioridad y consideración especial que les atribuye el Art. 1489, no ha de esperar a la aceptación de la obra ni a la liquidación final de cuentas y divergencias entre dueño y empresario.

El dictum de *Inter-Amer. Builders*, supra, tomado del Tribunal Supremo de España de que "el suplidor no adquiere ante el dueño más derechos que los que tenía el contratista, de manera que la cantidad adeudada está sujeta necesariamente a liquidación" y la paralela cita de Scaevola, *supra*, esc. 3, son incompatibles con la *raison d'etre* y consecuencia jurídica del citado Art. 1489, y antagónicas a nuestra propia jurisprudencia que califica la acción directa como remedio equitativo fundado en "consideraciones de orden público—propiciar el pronto pago a quienes ponen su trabajo y materiales en una obra ajena—y de orden moral—evitar el enriquecimiento del dueño y el empresario mediante el fraude o la confabulación—" *Amer. Surety Co.* v. *Tribunal Superior*, supra, a la pág. 455. El propio Muscius Scaevola, cuya contradicción señalamos, es fuente del criterio de Castán Tobeñas(⁸) al declarar que

---

(⁷)*Amer. Surety Co.* v. *Tribunal Superior*, supra, a la pág. 456.

(⁸)Castán Tobeñas, *Derecho Civil Español*, Tomo 4, págs. 462–463, 9na ed. (1961). A la pág. 463(1) Castán cita a Nart en su criterio de que no se trata de una

"esta acción directa está fundada en motivo de equidad por no ser lícito que dueño o empresario, o ambos, hasta por fraudulenta confabulación, se enriquezcan dañadamente con el esfuerzo o la aportación impagada de operarios y materialistas."

La preferencia otorgada a la reclamación de obreros y suplidores de materiales se justifica en la calidad de acreedores refaccionarios que ante la ley merecen. Bonet Ramón[9] así los equipara, y añade que "[e]l mismo principio que en la accesión de buena fe obliga al dueño del suelo a indemnizar el valor de los materiales incorporados, explica la acción que operarios y materialistas pueden ejercer contra el dueño de la obra, para cobrar de él lo que en circunstancias normales debiera haber cobrado el empresario."

La evidencia ofrecida en el juicio del presente caso dejó probado que al tiempo de deducir su acción civil la subcontratista recurrida Roberto Román & Cía., Inc., en reclamación de lo adeudádole por la empresaria José Negrón Crespo, Inc., la dueña de la obra Compañía de Fomento Industrial le tenía retenida a dicha contratista una cantidad que ampliamente cubre lo reclamado. Toda vez que dicha cantidad no puede sufrir merma en perjuicio del proveedor de trabajo y materiales, pues no son oponibles a su demanda las reclamaciones de Fomento contra su contratista por incumplimiento de contrato ni las defensas afirmativas de falta de aceptación de la obra y ausencia de vínculo contractual con el subcontratista, no incidió el juez sentenciador. El destino que en el contrato de empresa se asigne a los dineros retenidos, tal como costo de terminación de la obra

---

acción "directa excepcional o de concesión forzada, sino de una auténtica, verdadera y ejemplar acción de enriquecimiento injusto, intrínsecamente directa; es un caso claro de vigencia de la actio in rem verso: a través del patrimonio del contratista se enriquece el comitente, mientras se empobrecen correlativamente los operarios o suministradores, no ligados entre sí por causa jurídica alguna." (Contrato de obra y empresa, loc. cit. pág. 825.)

[9]Comentarios al Art. 1597 del Código Civil Español (1489 P.R.) en su obra *Código Civil Comentado*, pág. 1270, 2da ed. (1964).

en caso de abandono por el contratista y el cobro de multas y penalidades por tardanzas y otros incumplimientos de los requisitos pactados, contra cuyos riesgos cubre la fianza de ejecución y pago, cede ante la primacía de la acción directa del Art. 1489 investida y saturada de consideraciones de orden público y equidad.

La sentencia revisada debe ser confirmada.